MATT O'MALLEY (SBN 272802)
PATRICK MCDONOUGH (SBN 288285)
San Diego Coastkeeper
3900 Cleveland Avenue, Suite 102
San Diego, CA 92103
Ph: 619-758-7743
Email: matt@sdcoastkeeper.org

COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)
LIVIA BORAK BEAUDIN (SBN 259434)
1140 South Coast Highway 101
Encinitas, CA 92024
Ph: (760) 942-8505
Fx: (760) 942-8515
email: marco@coastlawgroup.com

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

SAN DIEGO COASTKEEPER, a non-profit corporation; COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a non-profit corporation,

               Plaintiffs,

    v.

CAL C. JOHNSON, dba AMERICAN RECYCLING, an individual,

               Defendant.

Civil Case No. **'21CV0191 L    BLM**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

**(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*)**

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper ("Coastkeeper") (collectively "Plaintiffs"), by and through their counsel, hereby allege:

## I.    JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201.

2.    On June 25, 2020, Plaintiffs sent a 60-day notice letter ("First Notice Letter") to Defendant  Cal C. Johnson, doing business as American Recycling as owner and/or operator of the Facility located at 4070 and 4080 Home Avenue, San Diego, California 92105 ("American Facility" or "Facility"), regarding Defendant's violations of the Clean Water Act and California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*), and *Order 2014-0057-DWQ as amended in 2015 and 2018* ("IGP").

3.    Plaintiffs sent the First Notice Letter via certified mail to American Recycling, Managing Agent, 4070 Home Avenue, San Diego, CA 92105, and to Cal C. Johnson, Legally Responsible Person, American Recycling, 2824 Jamul Highlands Rd., Jamul, CA 91935.  True and correct copies of the First Notice Letter and all enclosures are attached hereto as Exhibit 1 and incorporated herein.

4.    According to City of San Diego public records, American Recycling engages in industrial recycling operations at the facility located at 4070 and 4080 Home Avenue, San Diego, CA 92105, and continues to do so, under City of San Diego business license # 2003004237.

5.    According to City of San Diego public records, the American Facility is owned by Cal C. Johnson, 2824 Jamul Highlands Rd., Jamul, CA 91935.

6.     According to American Recycling's own documents, publicly available via the statewide Storm Water Multiple Application & Reporting Tracking System ("SMARTs") database, Cal C. Johnson is also the president, and legally responsible person, for American Recycling.

7.     Plaintiffs also sent the First Notice Letter to the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), and the Executive Officer of the San Diego Regional Water Quality Control Board ("Regional Board") as required by 40 C.F.R. § 135.2(a)(1) and 33 U.S.C. § 1365(b)(1)(A).

8.     Delivery of the First Notice Letter, sent via certified mail, United States Postal Service ("USPS") tracking number 7019 1120 0000 3322 4623, to 4070 Home Avenue, San Diego, CA 92105, was "refused." A true and correct copy of the tracking history for the aforementioned certified mail, available on the USPS website, is attached hereto as Exhibit 2.

9.     The copy of the First Notice Letter sent via certified mail, USPS tracking number 7019 1120 0000 3322 4593, to Cal C. Johnson, at 2824 Jamul Highlands Road, Jamul, California 91935, as the registered agent for American Recycling, was "unclaimed" and returned to sender. A true and correct copy of the tracking history for the aforementioned certified mail, available on the USPS website, is attached hereto as Exhibit 2.

10.     On November 25, 2020, Plaintiffs again attempted to send a Notice Letter regarding Defendant's violations of the Clean Water Act and IGP ("Second Notice Letter") via certified mail to both American Recycling at 4070 Home Avenue, San Diego, CA 92105, and Cal C. Johnson at 2824 Jamul Highlands Road, Jamul, California 91935, as the registered agent for American Recycling. Delivery of the Second Notice Letter was "refused" at both locations. A true and correct copy of the Second Notice Letter and attachments are attached hereto as Exhibit 3 and incorporated by reference.

11.     Delivery of the Second Notice Letter, sent via certified mail, USPS tracking number 7019 1120 0000 3322 4623, to 4070 Home Avenue, San Diego, CA 92105, was "refused." A true and correct copy of the tracking history for the aforementioned certified mail, available on the USPS website, is attached hereto as Exhibit 2. A true and correct copy of the returned certified mail envelope is also attached hereto as Exhibit 2.

12.     Delivery of the Second Notice Letter, sent via certified mail, USPS tracking number 7019 1120 0000 3322 4593, to Cal C. Johnson, at 2824 Jamul Highlands Road, Jamul, California 91935 was "unclaimed" and returned to sender as of January 11, 2021. A true and correct copy of the tracking history for the aforementioned certified mail, available on the USPS website, is attached hereto as Exhibit 2.

13.     The Clean Water Act's implementing regulations specify the manner in which service of a notice of intent to sue must be made. The regulations provide that "[i]f the alleged violator is an individual or corporation, service of notice shall be accomplished by certified mail addressed to, or by personal service upon, the owner or managing agent of the building, plant, installation, vessel, facility, or activity alleged to be in violation." 40 C.F.R. § 135.2(a)(1). Additionally, "[i]f the alleged violator is a corporation, a copy of such notice also shall be mailed to the registered agent, if any, of such corporation in the State in which such violation is alleged to have occurred." *Id.*

14.     A party's right to receive actual notice of certain claims against him is not violated when he has himself intentionally and successfully thwarted service of the very notice that he claims not to have received. *See Comm. on Grievances of the U.S. Dist. Court for the E. Dist. of N.Y. v. Feinman*, 239 F.3d 498, 499 (2d Cir. 2001) ("[A] party's constitutional right to receive actual notice of certain claims against him is not violated when he has himself intentionally and successfully thwarted service of the very notice that he claims not to have received"); *e.g., Reliance Ins. Co. v. Mast Constr. Co.,* 159 F.3d 1311, 1318 (10th Cir.1998) ("[I]t is well-settled that the effect of a written notice cannot be avoided by refusing service of that notice."); *Erhard v. Comm'r,* 87 F.3d 273, 274–75 (9th Cir.1996) (holding that actual notice requirement for tax deficiency

assessment is satisfied by a party's refusal of certified mail on the ground that "a taxpayer should not be allowed to defeat actual notice by deliberately refusing delivery of the IRS's deficiency notice").

15.    Plaintiffs have satisfied the Clean Water Act's citizen suit notice requirements by sending the Notice Letter via certified mail on two separate occasions to the correct addresses for the Owner and/or Operator of American Recycling and its registered agent.

16.    More than sixty (60) days have passed since Plaintiffs diligently sent the Second Notice Letter to Defendant and the State and Federal agencies via certified mail.

17.    Upon information and belief, neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

18.    Venue is proper in the Southern District of California pursuant to 33 U.S.C. § 1365(c)(1) because the source of the violations is located within this judicial district.

**II.    INTRODUCTION**

19.    Plaintiffs seek relief for Defendant's substantive and procedural violations of the IGP and the CWA resulting from its activities at the American Facility.

20.    Specifically, Defendant has discharged and continues to discharge polluted storm water from the American Facility to downstream waters and groundwater including Chollas Creek, San Diego Bay, and the Pacific Ocean (collectively "Receiving Waters") in violation of the express terms and conditions of the Clean Water Act, 33 U.S.C. §§ 1301, 1342.

21.    Defendant has also violated and continues to violate the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the IGP. These are ongoing and continuous violations of the Clean Water Act and the IGP.

22.     With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial facilities like the American Facility flow into storm drain systems, local tributaries, and the Receiving Waters.

23.     Among the Receiving Waters are ecologically sensitive areas providing essential habitat for dozens of fish, hundreds of bird, and numerous mammal species, as well as vital macro- and micro-invertebrate species which are an important link in the food web between the producers (leaves, algae) and higher consumers such as fish.

24.     This discharge of polluted storm water and non-storm water from the Facility causes and/or contributes to the impairment of downstream Receiving Waters and compromises or destroys their Beneficial Uses.

25.     Storm water and non-storm water contaminated with sediment, heavy metals, nutrients, bacteria, and other pollutants harm the special biological significance of the Receiving Waters. Discharges of polluted storm water and non-storm water to the Receiving Waters pose toxic, carcinogenic, and reproductive threats to the public and adversely affect the aquatic environment. For example, polluted storm water is deleterious to invertebrates, insects, larval fish, and local vegetation in the Receiving Waters.

26.     The polluted discharges from the American Facility also harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities, including Plaintiffs' members. The public's, including Coastkeeper's and CERF's members', use of the Receiving Waters for water contact recreation exposes people to dangerous pathogens, toxic metals, carcinogenic chemicals, and other contaminants resulting from storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation and aesthetic enjoyment, are also impaired by polluted discharges, as such discharges cause or contribute to ecosystem and food web degradation.

III.     **PARTIES**

27.     On information and belief, Cal. C. Johnson is the owner of the American

1    Recycling Facility.

2          28.    The San Diego County Assessor/Recorder/County Clerk maintains an online

3    searchable database of fictitious business names available at the following address:

4    https://arcc-acclaim.sdcounty.ca.gov/FBN/SearchTypeFbnByName. The database

5    includes a fictitious business name registry for "American Recycling" registered by Cal.

6    C. Johnson. A true and correct copy of the online record is attached hereto as Exhibit 4.

7          29.    Plaintiff Coastkeeper is a non-profit public benefit corporation organized

8    under the laws of the State of California with its main office in San Diego, California.

9    Coastkeeper is committed to protecting and restoring the San Diego region's water

10   quality and supply. A member of the international Waterkeeper Alliance, San Diego

11   Coastkeeper's main purpose is to preserve, enhance, and protect San Diego's marine

12   sanctuaries, coastal estuaries, wetlands, and bays from illegal dumping, hazardous spills,

13   toxic discharges, and habitat degradation.

14         30.    Plaintiff CERF is a non-profit public benefit corporation organized under the

15   laws of the State of California with its office located in Encinitas, California. CERF was

16   founded by surfers in North San Diego County and is active throughout California's

17   coastal communities. CERF was established to advocate for the protection and

18   enhancement of coastal natural resources and the quality of life for coastal residents. One

19   of CERF's primary areas of advocacy is water quality protection and enhancement.

20         31.    Many of Plaintiffs' members live and/or recreate in and around the

21   Receiving Waters. Plaintiffs' members use and enjoy the Receiving Waters to fish, sail,

22   boat, kayak, paddle board, surf, swim, hike, view wildlife and scenery, and engage in

23   scientific studies, among other activities.

24         32.    Defendant's failure to comply with the procedural and substantive

25   requirements of the IGP and the CWA results in discharges of polluted storm water to the

26   Receiving Waters. Defendant's polluted discharges degrade water quality and harm

27   aquatic life in the Receiving Waters and thus impair Plaintiffs' members' use and

28   enjoyment of those waters.

33.     The violations of the IGP and CWA at the American Facility are ongoing and continuous. Thus, the interests of Plaintiffs' members have been and will continue to be adversely affected by Defendant's failure to comply with the IGP and the CWA.

34.     The relief sought herein will redress the harms to Plaintiffs' members caused by Defendant's activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which they have no other plain, speedy, or adequate remedy at law.

35.     An actual controversy exists as to the rights and other legal relations between Defendant and Plaintiffs.

## IV.   LEGAL BACKGROUND

### A.     The Clean Water Act.

36.     The CWA requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1).

37.     Section 301(a) of the Clean Water Act prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA.

38.     "Waters of the United States" are defined as "navigable waters" and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

39.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

40.     The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce. *See* 40 C.F.R. § 122.2.

41.     The CWA confers jurisdiction over waters that are tributaries to traditionally

navigable waters where the water at issue has a significant nexus to the navigable water.

42.    The CWA requires all point source dischargers, including those discharging polluted storm water, achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 33 U.S.C. § 1311(b); 40 C.F.R. §125.3(a)(2)(ii)–(iii).

**B.    California's IGP.**

43.    Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. It allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water.

44.    California is a state authorized by the EPA to issue NPDES permits. In California, the State Board is charged with regulating pollutants to protect California's water resources. Cal. Water Code § 13001.

45.    The IGP is a statewide general NPDES permit issued by the State Board pursuant to Section 402 that regulates the discharge of pollutants from industrial sites.

46.    Between 1997 and June 30, 2015, the IGP in effect was *Order No. 97-03-DWQ* ("1997 Permit"). On July 1, 2015, pursuant to *Order No. 2014-0057-DWQ* ("2015 Permit"), the reissued 2015 IGP took effect. The 2015 Permit supersedes the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit. On July 1, 2020, pursuant to *Order 2014-0057-DWQ as amended in 2015 and 2018* ("2020 Permit"), the reissued 2020 IGP took effect.

47.    In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the IGP and comply with its terms or obtain and comply with an individual NPDES permit. 1997 Permit, Finding 2; 2015 & 2020 Permit § I.A.12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the IGP by submitting a Notice of Intent to Comply with the IGP ("NOI") to the State Board. 1997 Permit, Finding 3; 2015 & 2020 Permit § I.A.17.

48.     Violations of the IGP are violations of the Clean Water Act. 1997 Permit § C.1; 2015 & 2020 Permit § XXI.A.

**C.     The IGP Discharge Prohibitions.**

49.     The IGP contains certain absolute prohibitions. "All discharges of storm water to waters of the United States are prohibited except as specifically authorized by this General Permit or another NPDES permit." 2015 & 2020 Permit § III.A.

50.     The Discharge Prohibitions forbid the direct or indirect discharge of liquids or materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. 1997 Permit § A.1; 2015 & 2020 Permit § III.B.

51.     These provisions further prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance. 1997 Permit § A.2; 2015 & 2020 Permit § III.C.

52.     The IGP prohibits discharges that violate any discharge prohibitions contained in local Water Quality Control Plans ("Basin Plan") or statewide water quality control plans and policies. 2015 & 2020 Permit § III.D.

53.     The San Diego Basin Plan prohibits "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives." Basin Plan at 4-20.

54.     Accordingly, where the discharge does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 Permits.

**D.     The IGP Effluent Limitations.**

55.     The IGP Effluent Limitation requires permittees to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of BAT and BCT. 1997 Permit § B.3; 2015 & 2020 Permit § V.A.

56.     Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead,

and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include chemical oxygen demand ("COD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, nitrate + nitrite nitrogen ("N+N"), iron, phosphorus, enterococcus, and fecal coliform, among others.

57. Dischargers must develop and implement Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 1997 Permit § B.3; 2015 & 2020 Permit § V.A.

58. EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"). The Benchmarks provide a relevant and objective standard to determine whether a facility's BMPs are effectively developed and implemented to achieve compliance with BAT/BCT standards. *See* MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); *see also* 2015 MSGP Fact Sheet at 50.

59. Failure to develop or implement BMPs that constitute BAT and BCT is an IGP violation. 33 U.S.C. § 1311(b); 1997 Permit § B.3; 2015 & 2020 Permit § V.A.

60. The 2015 MSGP freshwater EPA Benchmarks include, but are not limited to: 100 mg/L for TSS; 15 mg/L for Oil and Grease; pH is 6.0–9.0 s.u;.75 mg/L for aluminum; .014 mg/L for copper; .082 mg/L for lead; .005 mg/L for selenium; and .12 mg/L for zinc. 2015 MSGP Fact Sheet at 55–56.

**E.    The IGP Receiving Water Limitations.**

61. The IGP Receiving Water Limitation prohibits storm water discharges and authorized non-storm water discharges from adversely impacting human health or the environment. 1997 Permit § C.1; 2015 & 2020 Permit § VI.B.

62. Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the IGP's Receiving Water Limitations. *Id.*

63. The IGP Receiving Water Limitation prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standard contained

in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. 1997 Permit § C.2; 2015 & 2020 Permit § VI.A.

64.     Water quality standards ("WQSs") consist of both "designated uses" for a body of water and a set of "criteria" specifying the maximum concentration of pollutants that may be present in the water without impairing its suitability for designated uses. 33 U.S.C. § 1313(c)(2)(A).

65.     WQSs applicable to dischargers covered by the IGP include, but are not limited to, those set out in the Basin Plan, and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38. Both the CTR and Basin Plan WQSs must be attained at the point of discharge.

66.     The Basin Plan identifies designated "Beneficial Uses" for water bodies in the San Diego region under Clean Water Act section 303. 40 C.F.R. § 131.

67.     The Beneficial Uses for Chollas Creek downstream from the American Facility include: potential contact water recreation, non-contact water recreation, warm freshwater habitat, and wildlife habitat. Basin Plan, Table 2-2. Species dependent on Chollas Creek include dozens of fish, bird, mammal, and reptile species.

68.     The Beneficial Uses for the San Diego Bay include: industrial service supply, navigation, contact water recreation, non-contact water recreation, commercial and sport fishing, wildlife habitat, preservation of biological habitats of special significance, estuarine habitat, marine habitat, spawning, reproduction, and/ or early development, shell harvesting, and rare, threatened or endangered species. *Id*., Table 2-3.

69.     Pacific Ocean Beneficial Uses include: industrial service supply; navigation; contact water recreation; non-contact water recreation; commercial and sport fishing; wildlife habitat; preservation of biological habitats of special significance; marine habitat; migration of aquatic organism; spawning, reproduction, and/or early development; shell harvesting; aqua culture; and rare, threatened, or endangered species. *Id.*

70.     Surface waters that cannot support their Beneficial Uses are designated "impaired" water bodies pursuant to Section 303(d) of the Clean Water Act.

71.     According to the 2016 303(d) List, Chollas Creek is impaired for benthic bifenthrin, chlorpyrifos, copper, cypermethrin, diazinon, indicator bacteria (such as enterococcus and E. coli), lead, malathion, nitrogen, phosphorous, trash, and zinc.

72.     Due to persistently high levels of copper, lead, and zinc in Chollas Creek, the Regional Board adopted a Total Daily Maximum Load ("TMDL") for these pollutants, which currently applies to Chollas Creek. *See* Resolution No. R9-2007-0043.

73.     Due to persistently high levels of total coliform, fecal coliform, and/or enterococcus at twenty beaches and creeks in San Diego County, including Chollas Creek, the regional board also adopted a TMDL for indicator bacteria which currently applies to Chollas Creek. *See* Resolution No. R9-2010-0001.

74.     The San Diego Bay Shoreline near Chollas Creek and the San Diego Bay Shoreline at the 32nd Street San Diego Naval Station are both impaired for benthic community effects and sediment toxicity. The San Diego Bay Shoreline between Sampson and 28th Streets is impaired for copper, mercury, polycyclic aromatic hydrocarbons, polychlorinated biphenyls, and zinc.

75.     The greater San Diego Bay is impaired for mercury, polycyclic aromatic hydrocarbons, and polychlorinated biphenyls.

76.     Polluted discharges from industrial sites, such as the American Facility, contribute to the degradation of these impaired surface waters and aquatic-dependent wildlife.

77.     The CTR includes numeric criteria set to protect human health and the environment. Based on 100mg/L hardness, the CTR maximum freshwater concentrations include: copper, 0.013 mg/L; lead, 0.065 mg/L; selenium, 0.005 mg/L; zinc, 0.12 mg/L. 40 C.F.R. § 131.38.

78.     The Basin Plan sets forth numeric and narrative water quality objectives for numerous pollutants including TSS, iron, and indicator bacteria.

79.     Because the IGP Receiving Water Limitation prohibits discharges that cause or contribute to an exceedance of any applicable WQS, discharges with pollutant levels in

excess of the CTR criteria, the Basin Plan water quality objectives, and/or other applicable WQSs, absent any authorized mixing or dilution zone, are violations of Receiving Water Limitations of the IGP. *See* 1997 Permit § C.2; 2015 & 2020 Permit § VI.A.

**F.     The IGP Storm Water Pollution Prevention Plan Requirements.**

80.     Prior to beginning industrial activities, dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). 1997 Permit §§ A.1.a, E.2; 2015 & 2020 Permit §§ X.A–B.

81.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. 1997 Permit § A.2; 2015 & 2020 Permit § X.

82.     The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; a description of individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan. 1997 Permit §§ A.1–10; 2015 & 2020 Permit §§ X.A–I.

83.     Dischargers must evaluate their SWPPP at least annually and revise it as

necessary to ensure compliance with the IGP. 1997 Permit §§ A.9–10; 2015 Permit §§ I.J.55, X.A.9, X.B.1; 2020 Permit §§ I.K.69, X.A.9, X.B.1. The 2015 and 2020 Permits require dischargers to certify and submit via the Storm Water Multiple Application & Report Tracking System ("SMARTS") database their SWPPP within 30 days whenever the SWPPP contains significant revisions. 2015 & 2020 Permit § X.B.2.

84.     The IGP requires dischargers to conduct an annual comprehensive site compliance evaluation that includes, *inter alia*, a review of all visual observation records, sampling and analysis results, and a review and evaluation of all BMPs. 1997 Permit §§ A.9.a–c; 2015 & 2020 Permit § XV.

### G.     The IGP Monitoring and Reporting Requirements.

85.     Permittees must develop and implement a monitoring implementation plan ("MIP"). 1997 Permit §§ B.1–2, E.3; 2015 & 2020 Permit, §§ X.I, XI. The MIP objectives are to ensure BMPs have been adequately developed, implemented, and revised, and confirm compliance with the IGP's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit §§ B.2.; 2015 Permit §§ I.J.55–56, X.I, XI; 2020 Permit §§ X.I, X, I.K.69–70.

86.     The MIP thus aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. 1997 Permit §§ B.2.a, B.2.d; 2015 Permit § XX.B; 2015 Permit Fact Sheet § J at 43; 2020 Permit Fact Sheet § J at 138.

87.     The IGP requires dischargers conduct monthly visual observations of storm water discharges, storm water drainage areas, and for the presence of unauthorized non-storm water discharges. 1997 Permit §B.4.a; 2015 & 2020 Permit § XI.A.1.

88.     Section B.5.a of the 1997 Permit required dischargers to collect storm water samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All storm water discharge locations must be sampled. *Id.* Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events

1  of the Wet Season and must explain in the Annual Report why the first storm event was
2  not sampled. *Id.*

3      89.    Section XI.B.1 of the 2015 and 2020 Permits require sampling from a
4  qualifying storm event ("QSE"), which is a precipitation event that produces a discharge
5  for at least one drainage area and is preceded by forty-eight (48) hours with no discharge
6  from any drainage area.

7      90.    The 2015 Permit defines Reporting Year as July 1 through June 30. 2015
8  Permit § I.M.62.b; 2020 Permit § I.N.76.b. Section XI.B.2 of the 2015 and 2020 Permits
9  require dischargers to collect and analyze storm water samples from two (2) QSEs within
10 the first half of each Reporting Year (July 1 to December 31), and two (2) QSEs within
11 the second half of each Reporting Year (January 1 to June 30).

12     91.    Section XI.B.11 of the 2015 and 2020 Permits, among other requirements,
13 provides that permittees must submit all sampling and analytical results for all samples
14 via the SMARTS database within thirty days of obtaining the results.

15     92.    The 1997 Permit required dischargers to analyze each sample for at least pH,
16 specific conductance, TSS, and total organic carbon, while the 2015 and 2020 Permits
17 require dischargers to analyze samples for TSS, O&G, and pH, at a minimum.

18     93.    The 1997 Permit further required dischargers to analyze each sample for
19 toxic chemicals and other pollutants likely to be present in significant quantities in the
20 storm water discharged from the facility.

21     94.    The 2015 and 2020 Permits require dischargers to analyze samples for other
22 pollutants likely to be present in significant quantities in the storm water discharged from
23 the facility that serve as indicators of the presence of all industrial pollutants.

24     95.    The 2015 and 2020 Permits also require dischargers to analyze storm water
25 samples for additional applicable industrial parameters related to receiving waters with
26 303(d) listed impairments or approved Total Maximum Daily Loads.

27     96.    Section B.14 of the 1997 Permit required that dischargers submit an Annual
28 Report to the applicable Regional Board by July 1 of each year. The Annual Report must

include (1) a summary of visual observations and sampling results, (2) an evaluation of the visual observations and sampling and analysis results, (3) laboratory reports, (4) the annual comprehensive site compliance evaluation report specified in Section A(9), (5) an explanation of why a facility did not implement any activities required, and (6) the records specified in Section B.13.i. *Id.*

97.     Section C.11.d of the 1997 Permit required facility operators to report any incidence of noncompliance with the Industrial Permit at the time monitoring reports are submitted. Reports of noncompliance must contain (1) a description of noncompliance and its cause, (2) the period of noncompliance, including exact dates and times, and if the noncompliance has not been corrected, the anticipated time it is expected to continue, and (3) steps taken or planned to reduce and prevent recurrence of the noncompliance.

98.     The 2015 and 2020 Permits require dischargers to submit an annual report to the applicable Regional Board by July 15 of each year. The Annual report must include a (1) Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the 2015 Permit, (2) an explanation for any non-compliance of requirements within the Reporting Year (3) an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual Evaluation.

99.     The IGP requires that all reports, certifications, or other information required by the Permit or requested by a regional board are signed by an authorized facility and certified for accuracy. 1997 Permit § C.9; 2015 & 2020 Permit § XXI.K.

**H.     The 2015 Permit Exceedance Response Actions Requirements.**

100.     The 2015 Permit includes Numeric Action Levels ("NALs") that are based on EPA Benchmarks. Like Benchmarks, the NALs indicate "the overall pollutant control performance at any given facility." 2015 Permit § I.M.61; 2020 Permit § I.N.75; *see also id.* § I.M.62 and Table 2.

101.     When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status." 2015 & 2020 Permit § XII.B. A permittee's Baseline status for any

given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. 2015 & 2020 Permit § XII.C.

102.   Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred. *Id*. By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of IGP ("Level 1 Evaluation"). 2015 & 2020 Permit §§ XII.C.1.a–c.

103.   Although the Level 1 Evaluation may focus on the drainage area(s) where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. 2015 & 2020 Permit § XII.C.1.c.

104.   Based upon the Level 1 Evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the Level 1 Evaluation, certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report prepared by a QISP that includes the summary of the Level 1 ERA Evaluation, and a detailed description of the necessary SWPPP revisions, and any additional BMPs for each parameter that exceeded an NAL. 2015 &2020 Permit §§ XII.C.2.a.i–ii.

105.   The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. 2015 & 2020 Permit § XII.C.2.a.iii.

106.   A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive QSEs that were sampled

subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. 2015 & 2020 Permit § XII.C.2.b.

107.   A discharger's Level 1 status for any given parameter changes to Level 2 status if sampling results indicate a NAL exceedance for that same parameter while the discharger is in Level 1. Level 2 status commences on July 1 following the Reporting Year during which the NAL exceedance(s) occurred. 2015 & 2020 Permit § XII.D.

108.   Dischargers with Level 2 status shall certify and submit via SMARTS a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the Reporting Year during which the NAL exceedance(s) occurred.

109.   For each new Level 2 NAL exceedance, the Level 2 Action Plan must identify which of the demonstrations in subsection D.2.a–c the Discharger has selected to perform. A new Level 2 NAL exceedance is any Level 2 NAL exceedance for (1) a new parameter in any drainage area, or (2) the same parameter that is being addressed in an existing Level 2 ERA Action Plan in a different drainage area. 2015 & 2020 Permit § XII.D.1.a.

110.   The Discharger shall certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) if this information has changed since previous certifications. 2015 Permit & 2020 Permit § XII.D.1.b.

111.   The Level 2 ERA Action Plan shall at a minimum address the drainage areas with corresponding Level 2 NAL exceedances. 2015 Permit & 2020 Permit § XII.D.1.c.

112.   All elements of the Level 2 ERA Action Plan shall be implemented as soon as practicable and completed no later than 1 year after submitting the Level 2 ERA Action Plan. 2015 Permit & 2020 Permit § XII.D.1.d.

113.   The Level 2 ERA Action Plan shall include a schedule and a detailed description of the tasks required to complete the discharger's selected demonstration(s) as described in subsections D.2.a through c of the 2015 and 2020 Permits. 2015 Permit &

2020 Permit § XII.D.1.e.

114.   On January 1 of the Reporting Year following the submittal of the Level 2 ERA Action Plan, a discharger with Level 2 status shall certify and submit a Level 2 ERA Technical Report prepared by a QISP that includes one or more of the following demonstrations: (a) Industrial Activity BMPs Demonstration, (b) Non-Industrial Pollutant Source Demonstration, or (c) Natural Background Pollutant Source Demonstration. 2015 & 2020 Permit §§ XII.D.2.a–c.

115.   NAL exceedances as defined in the IGP are not, in and of themselves, violations of the IGP. However, NAL exceedances indicate that a facility is performing poorly and failing to implement BMPs that achieve BAT and BCT.

116.   A "[d]ischarger that does not fully comply with the Level 1 status and/or Level 2 status ERA requirements, when required by the terms of this General Permit, is in violation of this General Permit." 2015 Permit § I.M.63; 2020 Permit § I.N.77.

V.   **FACTUAL BACKGROUND**

   A.   **Facility Site Information, Industrial Activities, and Pollutant Sources.**

117.   The American Facility first obtained IGP coverage to conduct industrial operations on May 11, 2011. The Facility submitted its most recent Notice of Intent ("NOI") to obtain IGP coverage under the 2015 Permit on August 11, 2015 ("2015 NOI"), under Waste Discharge Identification Number 9 37I023148.

118.   The Facility Standard Industrial Classification ("SIC") code is 5093 (Scrap and Waste Materials).

119.   According to the 2017 SWPPP, the American Facility's operations "consist of aluminum cans, plastic bottles and container recycling." 2017 SWPPP § 2.1.2. The American Facility only accepts beverage containers. Specific industrial activities conducted at the Facility include customer parking and unloading of raw materials, recyclables container collection, materials sorting, materials processing, compaction, and storage of raw, processed and waste materials. *Id.* § 2.1.2, Table 2.1.

120.   Upon information and belief, including numerous photos, inspection notes,

reports, and notices of violations from the City of San Diego and the Regional Board, as well as direct observation by Plaintiffs, the American Facility collects and sorts recyclable materials outdoors. Glass, plastic, trash and other debris is regularly littered throughout the American Facility, the adjacent sidewalk, and on Home Avenue.

121.   The American Facility uses certain equipment to process the materials, and washes this processing equipment, but the Facility SWPPP provides no further details regarding the specific type of equipment or industrial activities for which such equipment is used. *Id.*, Table 2.2.

122.   Raw materials are routinely stored around the edges of the southerly building until they can be processed inside the building. *Id.* § 2.1.3. The 2017 SWPPP states that the processed materials are stored in the northerly building, as well as outdoors in an overflow area outside the northerly building, until the processed material can be hauled offsite. *Id.* § 2.1.3.

123.   The Facility's 2017 Level 1 ERA Report acknowledges that "[c]ans, bottles, and other similar recyclable materials carried from customer's cars to the processing center" is an industrial activity, and a likely source of pollution. 2017 Level 1 ERA Report § 5.

124.   Upon information from numerous photographs and inspections conducted by City of San Diego and the Regional Board, and direct observations by Plaintiffs, excess liquid residue from beverage containers regularly discharges from the Facility and into the City of San Diego's Municipal Separate Storm Sewer System ("MS4") to such an extent that these residues have stained the Facility's driveways and discharge points.

125.   The Facility's 2017 SWPPP acknowledges that plastic, aluminum, and glass beverage containers, oil and grease, "metals", "debris", wash water, trash, and "liquids such as alcohol, soda, and juice" are present at the Facility and are associated with the Facility's industrial operations. However, the SWPPP only identifies oil and grease, TSS, and "metals" as potential storm water pollutants. 2017 SWPPP § 2.1.3, Table 2.1. The only "potential pollutants" identified in the SWPPP's BMP summary table are oil and

grease, metals, debris, and wash water. *Id.* Tables 3.4, 5.5–6.

126.   The Facility's MIP states the Facility analyzes storm water samples only for pH, oil and grease, total suspended solids, and metals. However, the Facility's own monitoring data establishes that its storm water discharges include pollutants such as barium, beryllium, cobalt, chromium, copper, nickel, lead, selenium, vanadium, and zinc, with consistently high levels of zinc.

127.   The Facility has never sampled for iron, aluminum, or COD.

128.   The 2017 Level 1 ERA Report states that "cans, bottles, and other similar recyclable materials" which are dropped off, sorted, and conveyed to the processing center are a likely source of zinc. 2017 Level 1 ERA Report § 5.

129.   Upon information and belief, including inspections from enforcement agencies, several other pollutants associated with industrial activity are present in the Facility's storm water discharges, including: indicator bacteria (such as E. coli, enterococcus, fecal coliform, and total coliform); iron; aluminum; COD; and trash.

130.   Facilities designated with SIC code 5093, like the American Facility, must analyze storm water samples for zinc, lead, iron, aluminum, and COD as these pollutants are commonly present as a result of associated industrial activities. 2015 Permit, Table 1.

131.   Upon information and belief, pollutants commonly present in stormwater discharges from facilities similar to the American Facility include bacteria, iron, aluminum, COD, and trash in addition to the pollutants already acknowledged by the 2017 SWPPP.

132.   Upon information and belief, the Facility's industrial activities occur, and industrial materials are handled, at various locations throughout the Facility, either outdoors without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and/or without adequate secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Facility.

133.   Upon information and belief, pollutants associated with the Facility's

industrial activities have been and continue to be tracked by vehicles, foot traffic, and dispersed by wind and storm water throughout the entire site, and on and off the Facility through ingress and egress. This results in employees, customers, and vehicles tracking trash, bacteria, sediment, oil and grease, metal particles, and other pollutants off-site.

**B.    Facility Drainage Areas, Storm Water Flow, and Discharge Locations.**

134.   Upon information and belief, the American Facility generally slopes in a southeasterly direction towards Home Avenue.

135.   The 2017 SWPPP claims "[d]uring a storm event, the majority of the site runoff is directed towards onsite landscaped areas," and that "[o]nly a minor portion of the driveway entrance and exit discharges directly to Home Avenue." 2017 SWPPP § 2.1.4.

136.   Upon information, belief, and direct observation, the Facility discharges water and non-storm water from its driveways, landscaped areas, or otherwise, which flow into the City of San Diego's MS4 and eventually to Chollas Creek approximately one-half mile downstream.

137.   The 2017 SWPPP acknowledges that "the nearest storm drain inlet is approximately 250 feet to the south along Home Avenue," which ultimately discharges into Chollas Creek. *Id.*

138.   Chollas Creek flows south-southwest and eventually discharges into San Diego Bay.

139.   According to the 2017 SWPPP, the Facility is divided into four drainage areas: Lot-1, Lot-2, Lot-3, and Lot-4.

140.   Lot-1 consists of the southerly building and the surrounding material storage and landscaped areas.

141.   According to the 2017 SWPPP, the southerly building, within which processing operations are conducted, has "an extensive drainage system that includes slotted drains that convey runoff into the City of San Diego Sewer System." 2017 SWPPP § 2.1.3.

142.   The SWPPP further states that "[s]everal area drains around the building also are connected to the City's sewer system," and that water and storm water captured by the drains "thus do not come in contact with the storm water discharge into Chollas Creek," indicating that these drains are connected to the sanitary sewer system rather than the MS4. *Id.*

143.   Upon information and belief, a significant amount of storm water and non-storm water from Lot-1 discharges into the City of San Diego's MS4.

144.   According to the Facility SWPPP and site map, Lot-2 consists of the customer parking, materials drop-off, and materials sorting area located in the middle of the Facility.

145.   The SWPPP claims that "much of Lot-2 [is] connected to the City of San Diego Sewer System." 2017 SWPPP § 5.5.5.

146.   The 2017 Level 1 ERA Report also identifies a "small concrete drainage swale conveying runoff" to a pervious landscaped strip, which the 2017 SWPPP claims is connected to the "City Sewer System," without identifying whether this refers to the sanitary sewer system or the MS4.

147.   Upon information and belief, the drain in the landscaped strip adjacent to Lot-2 is connected to the City of San Diego's MS4, and thus flows to Chollas Creek.

148.   Upon information and belief, including direct observation, the "pervious landscaped strip" adjacent to Lot-2 is also immediately adjacent to the sidewalk along Home Avenue. While this strip can retain and absorb or infiltrate small quantities of non-storm water or dry weather flows, the retention capacity of the landscaped strip is minimal, and storm water conveying pollutants from the Facility will quickly overwhelm the landscaped strip and discharge to the City's MS4.

149.   Upon information and belief, including photos, inspection reports, notices of violation, and direct observations, residual beverage container liquid, trash, and other pollutants spilled in the customer parking, collection, and sorting areas within Lot-2 are not captured by sanitary sewer inlets, enter the City of San Diego's MS4, and are

1  conveyed to Chollas Creek shortly downstream.

2  150.   Upon information and belief, including photos, inspection reports, notices of

3  violation, and direct observations, liquids and staining from excess beverage container

4  liquid regularly bypass the small concrete drainage swale in the driveway from Lot-2, and

5  discharge directly into the curb gutter along Home Avenue.

6  151.   According to the 2017 SWPPP and site map, Lot-3 consists of the northerly

7  building and surrounding areas which are used for storage of processed materials before

8  such materials are hauled offsite.

9  152.   The 2017 SWPPP claims the outdoor areas "will have a visqueen to cover

10  the exposed material to eliminate contact with precipitation." 2017 SWPPP § 2.1.3.

11  153.   Upon information and belief, significant quantities of materials are stored

12  outdoors without a visqueen or other adequate cover to prevent contact with storm water.

13  154.   The SWPPP and site map indicate that storm water from Lot-3 will

14  discharge from the northern driveway, and that this driveway includes a small concrete

15  drainage swale conveying runoff to a pervious landscaped strip, which the SWPPP claims

16  is connected to the "City Sewer System."

17  155.   Upon information and belief, the drain in the landscaped strip adjacent to

18  Lot-3 is connected to the City of San Diego's MS4, and thus flows to Chollas Creek.

19  156.   Upon information and belief, including direct observation, the "pervious

20  landscaped strip" adjacent to Lot-3 is also immediately adjacent to the sidewalk along

21  Home Avenue. While this strip can retain and absorb or infiltrate small quantities of non-

22  storm water or dry weather flows, the retention capacity of the landscaped strip is

23  minimal, and storm water conveying pollutants from the Facility will quickly overwhelm

24  the landscaped strip and discharge to the City's MS4.

25  157.   Upon information and belief, residual beverage container liquid, trash, and

26  other pollutants within Lot-3 discharge from the northern driveway, enter the City of San

27  Diego's MS4, and are thus conveyed to Chollas Creek shortly downstream.

28  158.   Upon information and belief, discharges from Lot-3 regularly bypass the

1    small concrete drainage swale and exit the northern driveway.

2        159.   The 2017 SWPPP and site map state that "[t]wo proposed asphalt berms

3    would be constructed near the driveway entrances to convey parking lot runoff to the

4    nearby landscaped area." 2017 SWPPP § 2.1.3.

5        160.   Upon information, belief, inspection photos, and direct observation, the

6    asphalt berms have never been constructed or installed.

7        161.   The 2017 SWPPP and site map indicate that a portion of the material storage

8    building and an additional outdoor materials storage area is located in Lot-4, and that

9    Lot-4 drains to an existing driveway leading to Home Avenue.

10       **C.    The Facility Discharges Contaminated Storm Water and Non-Storm**

11             **Water in Violation of the IGP.**

12       162.   Upon information and belief, the Facility discharges polluted storm water

13    and non-storm water during every significant rain event, as well as during some dry-

14    weather conditions, into the Receiving Waters.

15       163.   The Receiving Waters into which the Defendant discharges polluted storm

16    water are waters of the United States and therefore the IGP properly regulates discharges

17    to those waters.

18       164.   The resulting illegal discharges of polluted storm water and non-storm water

19    impact Plaintiff's members' use and enjoyment of the Receiving Waters by degrading the

20    quality of those waters, and by posing risks to human wellbeing, aquatic life, and

21    ecosystem health.

22       165.   Upon information and belief, including photos, inspection reports, notices of

23    violation, direct observations, and Defendant's own monitoring data, storm water and

24    non-storm water discharges from the Facility violate the Discharge Prohibitions, Effluent

25    Limitations, and Receiving Water Limitations of the IGP.

26       166.   Despite numerous inspections, notices, citations, and enforcement actions

27    related to the American Recycling Facility's violations of various permits, laws, and

28    regulations, the Facility Owner and/or Operator has failed to bring the Facility into

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    25

compliance, thus demonstrating a pattern and practice of disregard for the laws which govern the Facility's operations, and continuing violations of the IGP.

167.    On August 24, 2018, the Regional Board notified the American Recycling Facility Owner and/or Operator that the Facility was in violation of numerous provisions of the IGP.

168.    The Regional Board's notice identified "multiple stains and flows of offsite discharges of liquids from CRV containers onto the sidewalks, into earthen vegetated areas, and to the curb and gutter along Home Avenue," and "recycling materials and wastes outside on the ground throughout the site exposed to storm water" in violation of Section X.H of the 2015 Permit.

169.    The Regional Board's notice further noted the Facility's failure to implement basic BMPs and proposed additional BMPs as stated in the 2018 Level 1 ERA Report in violation of the 2015 Permit; failure to accurately update, and maintain copies of the SWPPP, site map, and other records in violation of Section X of the 2015 Permit; the failure of the 2017 Level 1 ERA Report to address NAL exceedances for TSS and O&G in violation of the 2015 Permit; and the Facility's failure to submit a Level 2 ERA Action Plan for zinc.

170.    On March 8, 2017, the City of San Diego Code Enforcement Section issued a Civil Penalty Notice and Order ("2017 Order") informing the American Facility of violations of several violations of the San Diego Municipal Code ("SDMC") which were observed on October 20, 2016, and March 3, 2017.

171.    The violations in the 2017 Order include failure to maintain the premises in compliance with Neighborhood Use Permit No. 5544 under SDMC § 126.0206; failure to obtain required permits, inspections, and approvals for the operation of a large recycling facility (SDMC §§ 126.0203; 141.0620(e)); failure to maintain premises free of non-incidental outdoor storage (SDMC § 142.1150); and failure to maintain the premises free of junk, trash, litter, and debris (SDMC § 54.0208).

172.    Inspection notes and photos from the City of San Diego demonstrate that

these violations were predominantly based upon the Facility's poor housekeeping, consistent debris, litter, and excess CRV liquid discharges, and lack of adequate BMPs.

173.   The 2017 Order directed the Facility Owner and/or Operator to correct these violations by May 15, 2017.

174.   The Facility did not correct the violations issued by the City of San Diego in the 2017 Order by May 15, 2017. As a result, the City of San Diego pursued administrative enforcement against the American Facility.

175.   On April 13, 2018, an administrative judge ordered Cal C. Johnson, the President and Legally Responsible Person for the American Recycling Facility, to pay $15,000 In civil penalties "for violations that existed, and continue to exist," at the Facility as well as to bring the Facility into compliance ("2018 Administrative Order").

176.   Following the 2018 Administrative Order, the Facility continued to violate provisions of the SDMC and Neighborhood Use Permit No. 5544.

177.   On February 14, 2019, the City of San Diego's Transportation and Storm Water Department, Storm Water Division, issued Civil Penalty Notice and Order CP-19-0002 ("Order CP-19-0002"), notifying the Facility of ongoing violations of SDMC §§ 43.0304 and 43.0307. CP-19-0002 identified numerous Notices of Violations previously issued to the Facility for its illicit discharges to the City of San Diego's MS4 observed on June 10, 2015; April 5, 2018; May 21, 2018; May 24, 2018; May 29, 2018; June 27, 2018; July 12, 2018; August 7, 2018; December 18, 2018; December 26, 2018; and January 23, 2019. Order CP-19-0002 noted the Facility had violated the law by "[a]llowing the discharge of waste water into the conveyance system and not maintaining Best Management Practices."

178.   The violations described in Order CP-19-0002 are also violations of the IGP.

**1.   Discharges of Polluted Storm Water from the Facility Violate IGP Discharge Prohibitions.**

179.   Upon information and belief, the American Facility has frequently and repeatedly discharged unauthorized non-storm water discharges in violation of the IGP.

1    *See* 1997 Permit § A.1; 2015 & 2020 Permit § III.B.

2       180.   Numerous inspections conducted by the City of San Diego and the Regional

3  Board have identified excess liquids from CRV containers discharging from the Facility

4  and oftentimes over the sidewalk and into curbside gutter, as well as staining from such

5  liquids evidencing such discharge. *See, e.g.*, City of San Diego Inspections dated May 24,

6  2018; May 29, 2018; July 3, 2018; July 12, 2018; December 26, 2018; and August 8,

7  2019; Regional Board Inspection dated August 21, 2018.

8       181.   Hundreds of photographs from these inspections and others showing such

9  discharges or staining demonstrate that the American Facility Owner and/or Operator has

10  illegally discharged non storm water, and failed to develop and/or implement BMPs that

11  would prevent these non-storm water discharges from comingling and/or discharging

12  from the Facility in violation of the Industrial General Permit.

13       182.   Upon information and belief, the American Facility has discharged, and

14  continues to discharge, numerous pollutants in concentrations that cause or threaten to

15  cause pollution, contamination, or nuisance in and around Receiving Waters in violation

16  of the IGP. *See* 1997 Permit § A.2; 2015 & 2020 Permit § III.C.

17       183.   The California Water Code defines "contamination" as "an impairment of

18  the quality of the waters of the state by waste to a degree which creates a hazard to the

19  public health through poisoning or through the spread of disease."

20       184.   "Pollution" is defined as "an alteration of the quality of the waters of the

21  state by waste to a degree which unreasonably affects . . . [t]he waters for beneficial

22  uses."

23       185.   The Facility's own storm water monitoring data demonstrates the Facility

24  has discharged concentrations of zinc and TSS in excess of various water quality

25  objectives, benchmarks, and other standards which were promulgated to protect human

26  health and the environment, as well as the Beneficial Uses of the Receiving Waters.

27       186.   The analytical results of storm water sampling at the Facility demonstrate

28  the Facility Owner and/or Operator has violated and continues to violate Discharge

Prohibition III.D of the 2015 Permit by discharging pollutants in excess of water quality objectives listed in the San Diego Basin Plan, and other "statewide water quality control plans" such as the California Toxics Rule, 40 C.F.R. § 131.38 ("CTR").

187.   The Facility's own monitoring data shows numerous instances of zinc concentrations above the CTR, thus violating Discharge Prohibition III.D.

188.   The San Diego Basin Plan designates beneficial uses for water bodies in the San Diego region, establishes water quality objectives and implementation plans to protect those beneficial uses, and establishes certain Waste Discharge Prohibitions. Basin Plan at 4-19.

189.   Waste Discharge Prohibition number 5 of the San Diego Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited. Allowances for dilution may be made at the discretion of the Regional Board." *Id.* at page 4-20.

190.   "Waste" is defined as, "waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation," which includes discharges of pollutants in storm water. Cal. Water Code, § 13050(d).

191.   Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the San Diego Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 Permit.

192.   Upon information and belief, the Regional Board has made no express allowance for dilution applicable to the American Facility's discharges or to the downstream Receiving Waters.

193.   The Facility's discharges of excess liquids from CRV containers constitute "waste," and such discharges violate Waste Discharge Prohibition number 5 of the San Diego Basin Plan, and Discharge Prohibition III.D of the IGP.

194.   The Facility's own storm water monitoring data shows numerous instances

of high TSS concentrations, which would adversely affect the beneficial uses of Receiving Waters, which thus violates Discharge Prohibition III.D of the IGP.

195.   Upon information and belief, the Facility has discharged storm water with concentrations of numerous pollutants in excess of the CTR standards and Basin Plan Water Quality Objectives in violation of the IGP.

196.   Defendant's failures to collect storm water samples in accordance with the IGP, and to analyze such samples for all required pollutants, do not excuse the Facility's violations of the Discharge Prohibitions provisions of the IGP.

197.   Each time the Facility discharges polluted storm water in violation of Sections III.B, III.C, or III.D of the Discharge Prohibitions provisions of the IGP is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

198.   These Discharge Prohibition violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that prevent such discharges.

## 2. Discharges of Polluted Storm Water from the Facility Violate IGP Effluent Limitations.

199.   Upon information and belief, Defendant has failed and continues to fail to develop and/or implement BMPs that would achieve compliance with BAT and BCT standards in violation of the IGP. *See* 1997 Permit § B.3; 2015 & 2020 Permit § V.A.

200.   The Facility's own storm water monitoring data indicates that on numerous occasions, the Facility's storm water discharges contained concentrations of zinc, copper, and total suspended solids in excess of applicable EPA benchmarks for these pollutants.

201.   For example, the Facility's storm water samples collected on January 14, 2019 showed concentrations of zinc at 2.6 milligrams per liter, over twenty-one times the EPA Benchmark of 0.12 milligrams per liter; concentrations of TSS at 676 milligrams per liter, over six times the EPA Benchmark of 100 milligrams per liter; and concentrations of copper at 0.076 milligrams per liter, over five times the EPA

Benchmark of 0.014 milligrams per liter.

202.   Upon information and belief, the American Facility Owner and/or Operator has failed and continues to fail to analyze storm water discharged from the Facility for numerous pollutants that result from the Facility's industrial operations.

203.   Upon information and belief, the American Facility discharges numerous pollutants, in addition to zinc, copper, and total suspended solids, that exceed EPA benchmarks.

204.   The Facility's numerous exceedances for zinc, copper, and total suspended solids indicate the Facility has failed and continues to fail to develop and/or implement BMPs that comply with BAT/BCT requirements.

205.   Each time Defendant discharges polluted storm water in violation of Effluent Limitation B.3 of the 1997 Permit and Effluent Limitation V.A of the 2015 and 2020 Permits is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

206.   These effluent limitation violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards.

### 3.   Discharges of Polluted Storm Water from the Facility Violate IGP Receiving Water Limitations.

207.   Upon information and belief, the Facility discharges storm water and non-storm water that cause or contribute to exceedances of numerous applicable WQSs enumerated in the CTR and Basin Plan.

208.   The Facility's own storm water monitoring data indicates the Facility has discharged elevated concentrations of toxic metals in excess of CTR standards.

209.   Of the Fifteen individual storm water samples collected by the Facility during the past five years, fourteen of these samples contained zinc concentrations above CTR limits. *See* Ex. 4.

210.   The Receiving Waters are impaired, and are unable to support the designated

Beneficial Uses, for some of the same pollutants discharged by the Facility.

211.   As noted in Section IV.E, paragraph 59, Chollas Creek is impaired for Zinc. Thus, the Facility's discharges of zinc in excess of the CTR standard cause and/or contribute to Chollas Creek's zinc impairment.

212.   The Facility's own monitoring data demonstrates that its discharges contain concentrations of TSS in excess of the Basin Plan water quality objective.

213.   The Basin Plan mandates "[w]aters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses," yet it's monitoring data shows multiple instances of high TSS concentrations.

214.   The Basin Plan explains that "[s]uspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can clog fish gills and interfere with respiration in aquatic fauna. They also screen out light, hindering photosynthesis and normal aquatic plant growth and development." Basin Plan at 3-31.

215.   The San Diego Bay Shoreline near Chollas Creek and the San Diego Bay Shoreline at the 32nd Street San Diego Naval Station are both impaired for benthic community effects.

216.   The Facility's storm water discharges containing elevated concentrations of TSS in excess of the applicable Basin Plan water quality objectives cause and/or contribute to the benthic community effects impairment of Receiving Waters in violation of the Receiving Water Limitations of the IGP.

217.   Upon information and belief, including photos, inspection reports, notices of violation, and direct observations, the Facility likely discharges elevated concentrations of several other pollutants including E. coli, enterococcus, fecal coliform, total coliform, iron, aluminum, COD, and trash in exceedance of applicable water quality standards. However, the Facility has failed and continues to fail to sample for any of the aforementioned parameters.

218.   Chollas Creek is impaired for indicator bacteria and trash. As such, the Facility's discharges of these pollutants in excess of the applicable Basin Plan objectives cause and/or contribute to the respective downstream impairments of Chollas Creek.

219.   Plaintiffs are informed, believe, and thereon allege that discharges of elevated concentrations of pollutants from the American Facility also adversely impact human health, thus violating the Permit Receiving Water Limitation C.1 of the 1997 Permit, and VI.B of the 2015 and 2020 Permits.

220.   Each time Defendant discharges polluted storm water in violation of the IGP's Receiving Water Limitations is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

221.   Plaintiffs are informed, believe, and thereon allege that the Facility's discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the IGP's Receiving Water Limitations.

**D.     Defendant Has Violated and Continues to Violate IGP SWPPP Requirements.**

222.   The American Facility Owner and/or Operator has conducted and continues to conduct operations at the Facility with an inaccurate and inadequately developed and/or implemented SWPPP and site map.

223.   Upon information and belief, the 2017 SWPPP contains many factual inaccuracies.

224.   The 2017 SWPPP claims that all of the Facility's "industrial operations are performed inside their southerly building with no exposure to precipitation."

225.   Photos, inspection reports, notices of violation, and direct observations demonstrate that many industrial activities at the American Facility occur outdoors exposed to precipitation, as the Facility collects, sorts, and stores recyclable materials outdoors exposed to storm water.

226.   Photos, inspection reports, notices of violation, and direct observations demonstrate that glass, plastic, trash, and other debris are regularly littered throughout the

Facility, on the sidewalk, and on Home Avenue.

227.   Photos, inspection reports, notices of violation, and direct observations demonstrate that excess liquid residue from beverage containers has discharged, and continues to discharge from the Facility and into the City of San Diego's MS4.

228.   Although Section 2.1.3 of the 2017 SWPPP claims that certain outdoor areas "will have a visqueen to cover the exposed material to eliminate contact with precipitation," photos, inspection reports, notices of violation, and direct observations demonstrate that materials are regularly stored outdoors without cover that would prevent contact with storm water.

229.   The 2017 SWPPP claims "the majority of the site runoff is directed towards onsite landscaped areas" via small drainage swales cut into the concrete driveways, such that "[o]nly a minor portion of the driveway entrance/exit discharges directly to Home Avenue." 2017 SWPPP § 2.1.3. Upon information and belief, residual beverage container liquid during dry conditions bypasses the small "swale" cut into the concrete, and illegally discharges directly to the curb gutter along Home Avenue.

230.   Upon information and belief, storm water and other liquids that are successfully diverted to the landscaped areas regularly escape the landscaped areas and flow into the curb gutter along Home Avenue.

231.   The American Facility Owner and/or Operator has failed and continues to fail to develop and/or implement a SWPPP that includes an adequate pollutant source assessment.

232.   The only potential storm water pollutants identified in the 2017 SWPPP's pollutant source assessment are O&G, TSS, and "metals." 2017 SWPPP § 2.1.3., Table 2.1.

233.   The 2017 SWPPP's BMP summary table only acknowledges O&G, metals, debris, and wash water as potential pollutants, and the SWPPP's monitoring program states the Facility only analyzes samples for pH, O&G, TSS, and "metals" without any further clarification.

234.    Upon information and belief, including the 2017 Level 1 ERA Report, inspection reports, photos, notices of violations, and direct observations, numerous additional pollutants are present at the Facility as a result of its industrial activities, including E. coli, enterococcus, fecal coliform, total coliform, iron, aluminum, COD, and trash, in violation of the IGP. The SWPPP's failure to acknowledge these pollutants is a violation of the IGP.

235.    The American Facility Owner and/or Operator has failed and continues to fail to develop and/or implement a SWPPP that contains BMPs that adequately: minimize the exposure of pollutants to storm water at the Facility; control and minimize polluted runoff from the Facility; treat and remove pollutants in storm water prior to discharge; prevent or control contaminated storm water from being discharged from the Facility; or prevent or control contaminated NSWDs from being discharged from the Facility.

236.    The 2015 and 2017 SWPPPs propose that two "asphalt berms would be constructed near the driveway entrances to convey parking lot runoff to the nearby landscaped areas."

237.    Upon information and belief, neither of the two asphalt berms described in the 2015 and 2017 SWPPPs have been constructed. The BMPs' inadequacies are documented in numerous photos, inspection notes, reports, and notices of violations from the City of San Diego and the Regional Board, as well as direct observations, which routinely show and describe glass, plastic, trash, and other debris littered throughout the Facility, on the sidewalks, streets, and gutters; stains and flows of offsite discharges of liquids from CRV containers; and even rancid odors from liquids discharged from the CRV containers.

238.    The Facility Owner and/or Operator has also failed to revise the Facility's SWPPP to ensure compliance with the IGP, despite repeatedly discharging high concentrations of numerous pollutants.

239.    The Facility Owner and/or Operator has been in daily and continuous violation of the IGP's SWPPP requirements since at least June 26, 2015.

1   ///

2       **E.    Defendant Has Failed to Develop, Implement, and/or Revise Adequate**
3             **Monitoring Implementation Plan at the Facility.**

4       240.   The American Facility Owner and/or Operator has conducted and continues
5   to conduct operations at the Facility with an inadequately developed, implemented,
6   and/or revised MIP.

7       241.   The Facility Owner and/or Operator has failed and continues to fail to
8   sample and analyze storm water discharges for all parameters required by the IGP.

9       242.   The 2017 SWPPP acknowledges SIC code 5093 applies to the Facility, and
10  as such, the Facility must, at a minimum, analyze samples for aluminum, iron, zinc, lead,
11  and COD.

12      243.   The American Facility has never sampled for iron, aluminum, or COD in
13  violation of the IGP. *See* 2015 & 2020 Permit § XI.B.6.d.

14      244.   The Facility Owner and/or Operator also fails to analyze storm water for E.
15  coli, enterococcus, fecal coliform, total coliform, and trash.

16      245.   As a result, the Facility Owner and/or Operator has failed and continues to
17  fail to sample and analyze for all parameters associated with its industrial activities in
18  violation of the IGP.

19      246.   The American Facility Owner and/or Operator has failed and continues to
20  fail to collect the required number of storm water samples for each reporting period.

21      247.   The IGP requires the American Facility to collect four samples during each
22  reporting period.

23      248.   During each of the 2016–2017 and the 2018–2019 reporting periods, the
24  Facility only collected two storm water samples.

25      249.   During the 2015–2016 reporting period, the Facility only collected one
26  storm water sample.

27      250.   During the 2017–2018 and the 2014–2015 reporting period, the Facility
28  failed to collect any storm water samples.

251.   Numerous QSEs occurred during each reporting period.

252.   The Facility's SWPPP and site map fail to identify any storm water retention BMPs that could adequately prevent the discharge of storm water, indicating that the Facility has discharged and continues to discharge storm water during each QSE.

253.   The Facility Owner and/or Operator has failed to collect the required number of storm water samples during each reporting period in violation of the IGP.

254.   The American Facility Owner and/or Operator also violated the IGP sampling requirements by collecting and analyzing samples from discharges that were not QSEs.

255.   Upon information and belief, the American Facility Owner and/or Operator fails to consistently, and/or adequately, conduct the required visual discharge observations and monitoring of BMPs.

256.   The Facility Owner and/or Operator has been in daily and continuous violation of the IGP's MIP requirements since at least June 26, 2015.

**F.    Defendant Has Violated the IGP's Reporting Requirements.**

257.   The American Facility Owner and/or Operator has failed to comply with the reporting requirements.

258.   Under the IGP, "[t]he Discharger shall provide the method detection limit when an analytical result from samples taken is reported by the laboratory as a 'non-detect' or less than the method detection limit. A value of zero shall not be reported." 2015 Permit § XI.B.11.c.

259.   The Facility's own storm water sampling parameter results from January 14, 2019 and February 14, 2019 state the concentrations of aluminum, iron, and COD in the Facility's storm water discharges on those dates was zero (0) milligrams per liter. However, the corresponding laboratory results publicly available on the SMARTS database show the laboratory failed to analyze the samples for aluminum, iron, or COD.

260.   The Facility's reporting of the levels of aluminum, iron, and COD as zero is a falsification of these reports in violation of the IGP.

261.   The Facility's laboratory results also show that its storm water discharges include other toxic metals such as barium, beryllium, cobalt, chromium, copper, nickel, selenium, and vanadium. These laboratory reports demonstrate that numerous samples for copper exceeded various benchmarks and water quality standards.

262.   The Facility Owner and/or Operator failed to include any sampling data for these metals in the Facility's parameter results in violation of the IGP.

263.   In each Annual Report, the Facility Owner and/or Operator certifies that: (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as required by the IGP; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the IGP, or will otherwise be revised to achieve compliance.

264.   The American Facility Owner and/or Operator has submitted multiple annual reports which were certified attesting to the Facility's compliance with the terms of the IGP.

265.   Upon information and belief, the Facility's certifications are erroneous.

266.   The Facility's Legally Responsible Person knew or should have known the Facility had failed to comply with numerous procedural and substantive provisions of the IGP, including inaccurate and falsified reporting of the Facility's parameter results, and thus certification of the Facility's annual reports is a falsification of these reports in violation of the IGP and the Clean Water Act.

267.   Given that the American Facility Owner and/or Operator has failed to comply with the IGP's reporting requirements and falsified reports and certification, the Facility has been in daily and continuous violation of the IGP's reporting requirements since at least June 26, 2015.

**G.    Defendant Has Violated the IGP's ERA Provisions.**

268.   The Facility Owner and/or Operator has failed to comply with several of the IGP's ERA requirements.

269.   The Facility's storm water monitoring data from the 2015–2016 reporting

period shows the Facility exceeded the annual NALs for zinc, copper, and TSS.

270.   The Facility entered Level 1 status for zinc, copper, and TSS on July 1, 2016.

271.   The Owner and/or Operator failed to complete a Level 1 ERA evaluation by October 1, 2016, as required by Section XII.C.1 of the 2015 Permit, and further failed to submit a Level 1 ERA report by the statutory deadline of January 1, 2017, as required by Section XII.C.2 of the 2015 Permit.

272.   The Facility's storm water monitoring data from the 2016–2017 reporting period shows the Facility again exceeded the annual NAL for zinc, and as such the Facility entered Level 2 for zinc as of July 1, 2017.

273.   On August 9, 2017, the Regional Board emailed the Facility Owner and/or Operator directing the Facility to comply with Level 2 requirements of the IGP.

274.   The Facility's consultant, Scott Berkebile with Montgomery & Associates, Inc., responded to the Regional Board stating the Facility "did not receive this notice in August 2016 to bump to Level 1, we feel this site should be Level 1 now, not a Level 2."

275.   On October 16, 2017, Erica Ryan, a Water Resource Control Engineer with the Regional Board, responded to Mr. Berkebile explaining the discharger is responsible for checking their own ERA level status under the terms of the IGP, regardless of whether they are notified by SMARTS or the Regional Board. Ms. Ryan further clarified that she specifically discussed this matter with the State Water Board.

276.   In direct contradiction to Ms. Ryan's instructions, on November 29, 2017, the American Facility Owner and/or Operator submitted a Level 1 Report for zinc only.

277.   The Facility reasoned that the "RWQCB never notified the LRP of the Level 1 status in Fall 2016." The Facility further claimed that "[t]wo pollutants fell back to Baseline while Zinc remained as an NAL exceedance, therefore only zinc was analyzed and addressed via the new BMPs. However, BMP [sic] should be effective in reducing all other pollutants impaired."

278.   On August 24, 2018, Ms. Whitney Ghoram, Sanitary Engineering Associate/

Storm Water Management Unit, sent Mr. Cal Johnson a staff enforcement letter (SEL) via email noting numerous violations of the IGP, including failure to prepare a Level 1 ERA for TSS, oil & grease exceedances.

279. To date, the Facility has failed to submit a Level 1 ERA Report for TSS and oil & grease exceedances, in violation of the IGP.

280. As the Facility entered Level 2 for zinc, the Facility was required to submit a Level 2 Action Plan by January 1, 2018. 2015 Permit § XII.D.1.

281. To date, the Facility has failed to submit any Level 2 Action Plan.

282. The Facility did not return to baseline for TSS and copper, as the Facility claims because it failed to complete any of the three elements required to return to baseline status, and thus remained in Level 1 status for TSS and copper.

283. The Facility has failed to complete a Level 1 ERA Report for TSS or copper, and as such failed to identify or implement any BMPs.

284. The American Facility Owner and/or Operator has also failed to submit a Level 2 ERA Technical Report in violation of the 2015 Permit.

285. The Level 2 Technical Report for zinc was due by January 1, 2019.

286. To date, the Facility Owner and/or Operator has failed to submit a Level 2 Technical report for any parameters.

287. The Facility's storm water monitoring data from the 2018–2019 reporting period shows the Facility again exceeded the annual NALs for TSS and copper, and as such, the Facility entered Level 2 for these parameters on July 1, 2019.

288. The Facility failed to submit Level 2 Action Plans by January 1, 2020 in violation of the IGP.

289. The Facility Owner and/or Operator has failed and continues to fail to conduct adequate Level 1 status evaluation and report for TSS and copper that complies with the IGP.

290. The Facility Owner and/or Operator has failed and continues to fail to comply with numerous ERA Level 1 and Level 2 requirements.

# V.    CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### Discharges of Contaminated Storm Water in Violation of the IGP's Discharge Prohibitions and the Clean Water Act.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

291.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

292.   Plaintiffs are informed and believe, and thereon allege that prohibited non-storm water discharges have and continue to discharge from the Facility. Defendant's ongoing failure to prevent unauthorized non-storm water discharges is a violation of the IGP and the CWA. 1997 Permit § A.1; 2015 & 2020 Permit § III.B; 33 U.S.C. § 1311(a).

293.   Defendant violated and will continue to violate this Discharge Prohibition each and every time unauthorized non-storm water discharges from the Facility.

294.   Plaintiffs are informed and believe, and thereon allege that Defendant has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Section A.2 of the 1997 Permit, and Section III.C of the 2015 and 2020 Permits.

295.   Plaintiffs are informed and believe, and thereon allege that Defendant has discharged and continues to discharge numerous pollutants in excess of water quality objectives listed in the Basin Plan in violation of Section III.D of the 2015 and 2020 Permits.

296.   Plaintiffs are informed and believe, and thereon allege that Defendant has been in violation of IGP Discharge Prohibitions at the Facility every day from June 26, 2015 to the present. Plaintiffs are informed and believe, and thereon allege that Defendant's violations of the IGP Discharge Prohibitions are ongoing and continuous.

297.   Each and every violation of the IGP Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the

acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from June 26, 2015 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SECOND CAUSE OF ACTION

### Discharges of Contaminated Storm Water in Violation of the IGP's Effluent Limitations and the Clean Water Act.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

298.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

299.   Plaintiffs are informed, believe, and thereon allege Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities from discharging through implementation of BMPs that achieve BAT/BCT at the Facility.

300.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards occur every time storm water discharges from the Facility.

301.   Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the IGP and the CWA. *See* 1997 Permit § B.3; 2015 Permit § I.D.32, V.A; 2020 Permit § V.A; *see also* 33 U.S.C. § 1311(b).

302.   Defendant violated and continues to violate the IGP Effluent Limitation each time storm water discharges from the Facility.

303.   Plaintiffs are informed and believe, and thereon allege, that Defendant has been in violation of the IGP Effluent Limitation at the Facility every day from June 26, 2015, to the present. Plaintiffs are informed, believe, and thereon allege Defendant's violations of the IGP Effluent Limitation and the CWA are ongoing and continuous. Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop and/or implement BMPs to achieve BAT/BCT at the Facility.

304.   Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

305.   Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since June 26, 2015. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## THIRD CAUSE OF ACTION
### Discharges of Contaminated Storm Water in Violation of IGP Receiving Water Limitations and the Clean Water Act.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

306.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

307.   Plaintiffs are informed and believe, and thereon allege, that the Facility discharges storm water containing levels of pollutants that adversely impact human health and/or the environment.

308.   Plaintiffs are informed and believe, and thereon allege, that Defendant discharges storm water containing levels of pollutants that cause or contribute to exceedances of WQSs from the Facility.

309.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

310.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that cause or contribute to exceedances of WQSs occur each time storm water discharges from the Facility.

311.   Defendant's discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to

exceedances of WQSs, are violations of the IGP and the Clean Water Act. 1997 Permit §§ C.1–2; 2015 & 2020 Permit §§ VI.A–B; 33 U.S.C. § 1311(b).

312. Plaintiffs are informed, believe, and thereon allege Defendant violated and will continue to violate the IGP Receiving Water Limitations every time storm water containing levels of pollutants that adversely impact human health or the environment, or that cause or contribute to exceedances of WQSs discharge from the Facility.

313. Plaintiffs are informed, believe, and thereon allege Defendant's violations of the IGP Receiving Water Limitations and the CWA are ongoing and continuous.

314. Defendant will continue to be in violation of the IGP and the CWA each time storm water containing levels of pollutants that adversely impact human health or the environment, or that causes or contributes to exceedances of WQSs is discharged from the Facility.

315. Each day that Defendant has discharged and/or continues to discharge polluted storm water from the Facility in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

316. Plaintiffs are informed, believe, and thereon allege Defendant has been in violation of the IGP Receiving Water Limitations every day since June 26, 2015. By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA since June 26, 2015. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## FOURTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and/or Revise the Facility's Storm Water Pollution Prevention Plans in Violation of the IGP and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

317. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

318. Defendant has failed and continues to fail to develop and/or implement an adequate SWPPP for the Facility.

319.   Defendant has failed and continues to fail to adequately revise the SWPPP, including the site map, for the Facility.

320.   Defendant conducts operations at the Facility each day without an adequately developed, implemented, and/or revised SWPPP. Defendant's failure to adequately develop, implement, and/or revise the SWPPP for the Facility is a violation of the IGP and the Clean Water Act. *See* 1997 Permit § A; 2015 & 2020 Permit § X; *see also* 33 U.S.C. § 1311(b).

321.   Defendant has been in violation of the IGP SWPPP requirements at the Facility every day from June 26, 2015, to the present. Defendant's violations of the IGP SWPPP requirements and the CWA at the Facility are ongoing and continuous.

322.   Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop, implement, and revise the Facility SWPPP.

323.   Each day Defendant operates the Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since June 26, 2015. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## FIFTH CAUSE OF ACTION

**Failure to Develop, Implement, and Revise Adequate Monitoring Implementation Plan in Violation of the IGP and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

324.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

325.   Defendant has failed and continues to fail to develop and/or implement an adequate MIP for the Facility. Defendant operates the Facility each day without an adequately developed, implemented, and/or revised MIP.

326.   Defendant's failure to adequately develop, implement, and/or revise the MIP for the Facility is a violation of the IGP and the Clean Water Act. *See* 1997 Permit § B;

2015 & 2020 Permit § XI; *see also* 33 U.S.C. § 1311(b).

327.   Defendant has been in violation of the IGP MIP requirements every day from June 26, 2015, to the present. Defendant's violations of the IGP MIP requirements and the CWA at the Facility are ongoing and continuous.

328.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to adequately develop, implement, and/or revise the Facility MIP.

329.   Each day that Defendant operates the Facility without developing, implementing, and/or revising an adequate MIP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since June 26, 2015. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SIXTH CAUSE OF ACTION

**Failure to Report as Required in Violation of the IGP and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

330.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

331.   Plaintiffs are informed and believe, and thereon allege Defendant has failed and continues to fail to submit accurate and/or complete Annual Reports for the Facility.

332.   The Defendant's failure to submit complete and accurate Annual Reports is a violation of the IGP and the Clean Water Act. *See* 1997 Permit §§ B.14, C.9–10; 2015 & 2020 Permit § XVI; *see also* 33 U.S.C. § 1311(b).

333.   Defendant conducts operations at the Facility each day without reporting as required by the IGP. Defendant has been in violation of the IGP's reporting requirements every day since at least June 26, 2015. Defendant's violations of the reporting requirements of the IGP and the CWA are ongoing and continuous.

334.   Defendant will continue to be in violation of the IGP and the CWA each and

1   every day it fails to comply with the IGP reporting requirements at the Facility.

2   335.   Each and every violation of the IGP reporting requirements is a separate and

3   distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the

4   acts and omissions alleged above, Defendant is subject to an assessment of civil penalties

5   for each and every violation of the CWA occurring since June 26, 2015. 33 U.S.C. §§

6   1319(d), 1365, and 40 C.F.R. § 19.4.

7   ### SEVENTH CAUSE OF ACTION

8   **Failure to Properly Monitor in Violation of the IGP.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

9

10   336.   Plaintiffs incorporate the allegations contained in the above paragraphs as

11   though fully set forth herein.

12   337.   Plaintiffs are informed and believe, and thereon allege, that Defendant has

13   failed and continues to fail to conduct the requisite visual observations of storm water

14   discharges at the Facility. Defendant's failure to conduct the requisite visual observations

15   at the Facility is a violation of the IGP and the CWA. *See* 1997 Permit §§ B.3–4; 2015 &

16   2020 Permit § XI.A; *see also* 33 U.S.C. § 1311(b).

17   338.   Defendant has failed to collect and analyze the required number of storm

18   water samples the Facility. Defendant's failure to collect and analyze the required

19   number of storm water samples at the Facility is a violation of the IGP and the CWA.

20   1997 Permit §§ B.5.a–b, 2015 Permit & 2020 Permit §§ XI.B.1–3; 33 U.S.C. § 1311(b).

21   339.   Defendant has failed and continues to fail to analyze all collected samples

22   for all required parameters in violation of the IGP and the CWA. *See* 1997 Permit §§

23   B.5.c, B.6; 2015 & 2020 Permit § XI; *see also* 33 U.S.C. § 1311(b).

24   340.   Plaintiffs are informed and believe, and thereon allege, that Defendant has

25   failed and continues to fail to comply with the IGP's monitoring requirements at the

26   Facility since June 26, 2015. Defendant's violations of the IGP monitoring requirements

27   and the Clean Water Act are ongoing and continuous.

28   341.   Defendant will continue to be in violation of the IGP and the CWA each and

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES   47

1  every day it fails to comply with the IGP's monitoring requirements.

2  342.   Each and every violation of the IGP's monitoring requirements is a separate

3  and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing

4  the acts and omissions alleged above, Defendant is subject to an assessment of civil

5  penalties for each and every violation of the CWA occurring since June 26, 2015. 33

6  U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## EIGHTH CAUSE OF ACTION

**Failure to Comply with ERA Requirements in Violation of the IGP and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

343.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

344.   Plaintiffs are informed and believe, and thereon allege that the Facility Owner and/or Operator has failed and continues to fail to conduct adequate Level 1 status evaluations for multiple pollutants at the Facility in violation of the IGP.

345.   Plaintiffs are informed and believe, and thereon allege that the Facility Owner and/or Operator has failed and continues to fail to submit adequate Level 1 ERA Reports for multiple pollutants at the Facility in violation of the IGP.

346.   Plaintiffs are informed and believe, and thereon allege that the Facility Owner and/or Operator conducts operations at the Facility each day without conducting an adequate Level 1 Evaluation and/or without submitting an adequate Level 1 ERA Report in violation of the IGP. *See* 2015 & 2020 Permit § XII.C.

347.   Plaintiffs are informed and believe, and thereon allege that the Facility Owner and/or Operator has failed and continues to fail to submit Level 2 Action Plans for multiple pollutants in violation of the IGP.

348.   Plaintiffs are informed and believe, and thereon allege that the Facility Owner and/or Operator has failed and continues to fail to submit Level 2 Technical Reports for multiple pollutants in violation of the IGP.

349.   The Facility Owner and/or Operator will continue to be in violation of the IGP and the CWA each and every day the Facility Owner and/or Operator fails to comply with the Level 1 and Level 2 ERA requirements at the Facility.

350.   Plaintiffs are informed and believe, and thereon allege that the Facility Owner and/or Operator's violations of the Level 1 and Level 2 ERA requirements of the IGP and the CWA are ongoing and continuous.

351.   Every day the Facility Owner and/or Operator conducts operations at the Facility without conducting an adequate Level 1 status evaluation, and/or without submitting adequate Level 1 ERA Report, Level 2 Action Plans, and/or Level 2 Technical Reports is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

352.   The Facility Owner and/or Operator has been in daily and continuous violation of the IGP's Level 1 status ERA evaluation requirement every day since October 21, 2016.

353.   The Facility Owner and/or Operator has been in daily and continuous violation of the IGP for failing to submit adequate Level 1 ERA Reports every day since January 1, 2017.

354.   The Facility Owner and/or Operator has been in daily and continuous violation of the IGP for failing to comply with Level 2 ERA requirements since at least January 1, 2018.

355.   The Facility Owner and/or Operator has been in daily and continuous violation of the IGP for failing to certify and submit Level 2 Technical Reports since January 1, 2019.

356.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the Level 1 status Evaluation requirements occurring from October 21, 2016, to the present, and for each and every violation of the Level 1 ERA Report requirements occurring from January 1, 2017, to the present, for each and every violation of the Level

2 Action Plan requirement occurring from January 1, 2018, and for each and every violation of the Level 2 Technical Reports requirement occurring from January 1, 2019 pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. § 1319(d), 1365, and 40 C.F.R. § 19.4.

357.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

358.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray judgment against Defendant as set forth hereafter.

**VI.    RELIEF REQUESTED**

359.   Plaintiffs respectfully request that this Court grant the following relief:

a.    A court order declaring the Defendant to have violated and to be in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to comply with discharge prohibitions, effluent limitations which include BAT/BCT requirements, and receiving water limitations, and for failing to comply with the other substantive and procedural requirements of the IGP as set forth within this Complaint;

b.    A court order enjoining Defendant from discharging pollutants from the Facility to surface waters in violation of the Clean Water Act and IGP;

c.    A court order requiring Defendant to implement affirmative injunctive measures designed to eliminate Defendant's violations of the substantive and procedural requirements of the IGP and the Clean Water Act;

d.    A court order assessing civil monetary penalties for each violation of the CWA at $37,500.00 per day per violation for all CWA violations after January 12, 2009, and $55,800.00 per day per violation for violations that occurred after November 2, 2015,

1  as permitted by CWA Section 309(d), 33 U.S.C. § 1319(d) and Adjustment of Civil
2  Monetary Penalties for Inflation, and 40 C.F.R. § 19.4.
3      e.    A court order awarding Plaintiffs their reasonable costs of suit, including
4  attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean
5  Water Act, 33 U.S.C. § 1365(d); and
6      f.    Any other relief as this Court may deem appropriate.
7  Dated: February 1, 2021

8                              Respectfully submitted,

9                              COAST LAW GROUP LLP
                               By: s/Livia B. Beaudin
10                             LIVIA B. BEAUDIN
11                             Attorney for Plaintiffs
                               COASTAL ENVIRONMENTAL
12                             RIGHTS FOUNDATION
13                             E-mail: livia@coastlawgroup.com

14
                               SAN DIEGO COASTKEEPER
15                             By: s/Matt O'Malley
16                             MATT O'MALLEY
17                             Attorney for Plaintiffs
                               SAN DIEGO COASTKEEPER
18                             E-mail: matt@sdcoastkeeper.org

19
20
21
22
23
24
25
26
27
28